is 14-1281, XpertUniverse v. Cisco Systems. There are three main issues on appeal for XU. One is fraudulent concealment, punitive damages, and the trade secret misappropriation nondisclosure agreement. The first two involve the substantial evidence test, and I suggest that while the district court and Cisco did acknowledge and did give lip service to the test, they did not apply it in practice. They resolved disputes in favor of Cisco, they drew inferences in favor of Cisco, and they basically focused heavily on Cisco's evidence rather than XU's evidence. Why don't you focus, at least for my purposes, on what I think you think is the second question, which is the causation. Because even if you prevail on the materiality, it strikes me that the district court wrote a very persuasive opinion as to whether or not there was no substantial evidence to establish causation. In other words, any damages resulting from the difference between whether or not it was denied or just not approved. So can you explain that, or point me to the evidence there? You're focusing on the question of causation. I suggest the evidence is overwhelming on the evidence of causation. The evidence of causation is very similar to the evidence of materiality. The evidence shows, first of all, that Elizabeth Ice, who is the CEO of Expert Universe, believes that she was continuing to work with Cisco, that they were making progress, that she need not worry about the paperwork, that the only problem was training the Cisco sales force. We have statements from Weiss, or Weiss, the key member of the governance council, who said if he were XU, he'd want to know about the denial. Sundara said knowing of the denial could have been important. XU, these are Cisco witnesses who said that. They had their system integrated with Genesys already, before they even started with Cisco. They could have moved with Genesys, I guess, is the issue. And in fact, Sundara said there was a risk of Genesys buying out XU and then we've lost everything. Yeah, but the district court went through all of that, and with respect to Genesys, for example, he said there was no evidence that XU was ever up for sale, that Genesys ever made a bid. So there was suggestions with regard to a variety of these things, including Citibank, but he went through the analysis with regard to Citibank and showed why that didn't establish causation. So it seems like he went through all of what you're hearing, and he prepared a pretty persuasive argument that there was not sufficient basis to establish causation. He went through it, Your Honor, but here's a quote from Hernandez. Hernandez is the key guy. XU would go with Genesys if a Cisco deal couldn't be worked out. XU already had an arrangement with Genesys at 1651, pages 1832 and 33. Sundara said the risk of Genesys buying out XU, and then we've lost everything. These are witnesses of Cisco. The jury had a right to rely on that testimony. The testimony made clear, supplemented by ICE's testimony, who said that she and Victor Friedman both said that the situation would have been different had they been told there was a denial in April of 2006. They had an arrangement with Genesys. They were ready to go with Genesys. It was only because the key person at Genesys went over to Cisco and talked XU into going with Cisco that they didn't go with Genesys. And your position is that if they had known they were denied as opposed to just knowing that they had not been approved, then that's the distinction over that nine-month period that would have led them necessarily to go with Genesys as opposed to waiting? Absolutely, Your Honor. There's a big difference between not actually the language that she used was, I knew we didn't have an approval. What she was saying, if you read her testimony, quoted on grade two, you will see that what she was really saying was she didn't yet have an approval. There's a big difference between not yet having an approval and being denied because Sundara, who was the one who introduced XU to the solutions process, basically said that denial was final. Now, they argue there's a separate document showing it's not final. We were never shown that document. We were never told that it wasn't final. The jury had a right. Your Honor, even so, wasn't the damages award very speculative? Your Honor, the damages were not speculative. The expert witness, Braddock, for Expert Universe relied on two reports, the S&P report, the Duffin-Phelps report. Wagner, the expert for those reports, it was proper for those reports to be based on information from the client involved. If you look at... Just as an aside, that $70 million represented just the entire value of the company, right? His analysis was, those two reports looked at what was the value of the company because Braddock's analysis was, what was the value before the event? What was the value after the event? The ranges were from $70 million to $225 million. He took the lowest figure and suggested it. The jury took the lowest figure, $70 million. If you look at grade 18, it has a list of Braddock's analysis. This is as thorough analysis as you can possibly do under circumstances such like this. He looked, he verified the reports, he checked the reports, he determined their projections were reasonable, conservative, he studied Ex-U's financial history, he analyzed voluminous business records, researched the size of the market. This was not just a lost profits case. This was, what was the company valued at? Citigroup said, when they first learned about it, that it was a breakthrough concept that they would earn tens to hundreds of millions of dollars. They offered, IBM offered $20 million, or considered offering $20 million for a standstill agreement for one year. That's not an agreement to get involved that just don't do anything for one year. I suggest that the evidence here is more than enough for a reasonable jury to have ruled in favor of Ex-U, and that the district court committed clear error in taking that decision away from the jury. If there are no other questions on that, I'd like to go on briefly to the punitive damage issue. The punitive damage issue revived the $70 million bond around Hernandez, and Hernandez, the test is, the jury was properly instructed. A managing agent is one who exercises discretionary authority over policies that affect a substantial portion of the company that are likely to come to the attention of corporate leadership. We have cited a case, the Mitry case versus Walgreen, 9th Circuit, 2014, which had facts parallel to these. We had a JMO granted, reversed. We had a person who was alleged to be the managing agent who was four levels below the president, who was responsible for four states out of 50 states. Here we have Hernandez, who is the director of product management of this key unit responsible for the concealment. He was second in command of that unit. He was responsible for developing and marketing all of the products from that unit, including Cisco's competing product, Samba. He admitted it fell on his shoulders as head of the product management, whether to reapply for Solutions Plus. I suggest there's more than enough evidence here to have justified the court instructing, and not only justified, to have mandated the conclusion. The last point is the trade secret point. If you wait one half second, I need to water the system. The trade secret misappropriation point. We have focused only on two trade secrets that the district court found were, in fact, protectable as trade secrets, because they relied on a specific architecture diagram. We have shown drawings that were submitted in the district court as evidence of what XU's architecture diagram was, and of what the expert advisor, remote expert products were of Cisco. We have color-coded them to show how they overlapped in significant respects. Inexplicably, the court held that there was no evidence of use by Cisco, even though those diagrams show use by Cisco in those two products. The problem is compounded by the fact that the court found that the NDA was violated because Cisco included material given to it by XU in a patent application, and the material included the architecture diagram. He denied summary judgment because he said there was a genuine disputed issue of material fact. That same genuine issue of material fact is the essence of the basis for the misappropriation argument, and I suggest that given all that, summary judgment should not have been granted. But the court found that there was no use made of these alleged trade secrets, right? Yes, but the fact is that the expert advisor and remote expert products, the diagram we show, show that they were used. It shows that they were included in those systems. Those systems were actually employed and used by Cisco, and they included key elements of the architecture diagram of expert universe. So in fact, the district court's finding that they were not used is clearly erroneous and not a basis for granting summary judgment in this case. Unless there are some questions, I will reserve the rest of my time for rebuttals. Good morning. May it please the court. I'd like to begin, as you did, with causation. The district court was absolutely correct that as a matter of law, there was no basis, no legally sufficient basis to find that any fraudulent concealment caused any harm to XU. And it's hard to improve, your honor, upon the district court's analysis at A1721, but just to take the three possible supposed partnerships or customers, Genesys, IBM, or the customer, Citibank. Genesys, there's no evidence, no evidence, that there's any possibility that XU could have had a partnership with CIT. There was no Genesys witness at the trial. There was no documentary evidence of any communication between Genesys and XU after 2004. And my learned friend, Mr. Dunner, referred you to Hernandez's email where he said, oh, we have an arrangement ready to go with Genesys, but he neglected to tell you that was back in July 2005. The relevant email is at A5170. The testimony is at A1651. Nothing that Hernandez said about hearsay in July 2005 is evidence that Genesys was ready to go as a partner in April 2006. So there's nothing on Genesys. IBM is a potential partner. Again, there's no evidence that had XU known, at least that they did know and there was no materiality, but just focusing on causation, there's no evidence denied, rather than not approved, that it would have been able to partner with IBM. Now, Mr. Dunner again referred you to the possibility, oh, well, IBM considered a standstill agreement. That was prior to the April 2006 time period and they never entered into it. So the discussion of an agreement that was never entered into prior to the time period is not evidence that IBM was an available partner. Now, it's clear, I mean, there was testimony and I think Mr. Dunner referred to some of it by Mr. Friedman and Ms. Isis and there was that they lost money as a result of the denial, right? Is the problem there that there's just no causation established between, yes, if they had been picked for Solutions Plus, they would have made a lot more money presumably or had a higher value, but that's not attributable then to the denial versus the non-approval. That's exactly right, Your Honor. There is no evidence that XU would have made any money in any way by virtue of knowing the semantic difference between denied and not approved. It couldn't have partnered, there's no evidence it would have partnered with Genesys, there's no evidence it would have partnered with IBM, and there were no clients. Let's remember, this is a company that never had a single customer, a single sale, or a single finished product. And, Your Honor, you're quite right that therefore the damages evidence is highly speculative here, but just sticking to causation for a moment, Your Honor, their theory was we could have had a partnership with Genesys or IBM, and then we could have sold to a customer like Citibank or FedEx. None of those people are in the picture. And, Your Honor, of course if Ms. Ice, the former president of XU, or Mr. Friedman, its founder, give you conclusory self-serving statements, oh, we were capable of partnering with Genesys, oh, we had big fans at IBM, that's worthless. That's conclusory self-serving testimony that wasn't backed by a single witness or piece of documentary evidence. Well, do you need more than, I mean, assuming we buy the argument about materiality, that it was material, and that they might have behaved differently if they had gotten a denial as opposed to a non-approval at the time, so seven months elapsed, would have been sufficient if they had just gone up and said, yeah, we would have been more aggressive. If we had known that the Cisco deal was dead and gone, we would have behaved more aggressively in trying to do whatever we would need to do for our business during that seven-month period. One, was there evidence of that, and two, is it your position that if there was evidence, it was just insufficient to establish causation to any particular damage? Your Honor, our position is there was no evidence of any harm, of any monetary harm as a result of the statement. I would like to have a chance to say that there was no evidence of materiality either, but if we assume for a moment there was some material difference between you're not approved, you're denied, when either way, they were still open to reconsideration, and that's a heroic assumption. It's unsupported by the record, but if we assume that there's still no causation and there's no evidence of damages, that isn't 100% speculative. So we still win for no causation and for no damages, but let me just complete the picture on why there's no causation. For them to have made any money, they need a partner. There's no reason to work with XU as a stand-alone. They need to have either Cisco or Genesis or IBM as a partner to get their product out, and second, they need to have a customer. Now there is no evidence they could have made it through all those steps. There's no partner on the scene in April of 2006. There's no Genesis. There's no IBM. There wasn't a single witness. If they were so ready to go with Genesis and IBM, but for Cisco, then why wasn't there a single IBM or Genesis witness in the case? In Citibank, as the district court explained, the potential Citibank customer account collapses in the summer of 2006. For reasons that have nothing to do with this case. Nothing to do with this case. Citibank has a reorganization. It fires 17,000 people. It has no money, and it drops the talk about a potential pilot project. A pilot project, by the way, is far cry from a partnership, and a partnership is a far cry from sales to actual customers. So you have to indulge a whole fanciful series of assumptions to think that it would have made any difference if XU had known this semantic difference, because there was no there. There was no one else to partner with. There was no one else to sell to. There was no customer out there, and there was no evidence of any market traction. Now if I could turn, Your Honor, even if you thought, well, didn't they lose some money? The answer then, as Judge Lori points out, is that their evidence of the amount of damages was totally speculative, unable to satisfy the clear California law requirement of reasonable certainty as to both the occurrence and the amount of damages, and it was speculative, if I could just go back, if we're finished on inquisition, Your Honor, may I turn to damages for a moment? Now, Mr. Braddock's testimony is speculation all the way down. It doesn't get any better if he relies on the Standard and Poor's and Duff and Phelps reports. Remember, those are excluded. The reports themselves are excluded by the court as, quote, inherently speculative. So this is Braddock just testifying. But as the Duff and Phelps and Standard and Poor's reports both make clear, one's 2005, one's 2006, they're based on XU's own projections, and they're full of disclaimers saying management's projections would have to be accurate. So Braddock can't give any independent authority to XU's own self-serving, hopeful, aspirational projections of revenues that are completely unsupported. When Mr. Braddock says, well, I'm relying on a report that assumes sales of XYZ in 2006, there were no sales in 2006. There were no revenues in 2006. And he was projecting a 30,000 percent exponential increase in revenues over a four-year period based on these reports. That's exactly the kind of evidence that the California Supreme Court in Sargon v. USC and the cases on which it relies, Parler Enterprises, Kids' Universe, the Group case, California would, I'm sorry to put it so bluntly, but laugh that kind of damage as evidence out of court because it's speculation all the way down. In fact, there's no California case that has ever upheld a lost profits or lost value projection for a company that is a new business that has no customers, no sales, no revenues, no historical track record in the market whatsoever. In fact, in the cases we cite like Sargon, Sargon had a dental cream parlor in Parler Enterprises, had at least one ice cream parlor. Here we have nothing. We have no historic sales. So do we need, under that theory, do we need a new trial on damages? You do not, Your Honor, because there was no other basis on which XU submitted any claim for damages or any evidence of damages. They could have easily said, well, here's another company that had a project like ours and here's how much money they made. Compare us to them. They didn't submit that. They could have said, here's how much our out-of-pocket costs were over that time period. Pay us those. They didn't submit that. So they have waived the opportunity to produce a different damages theory. They put all their eggs in the lost profits, lost value basket. And just as in Kids' Universe, just as in Parler Enterprise, California law would hold as a matter of law that the evidence presented was insufficient. This is not a case where you should send it back. But, Your Honor, we actually went on materiality as well. If I could just go back to, we've discussed one basis the district court had for the J. Moll on fraud, which is causation. We've discussed an alternative theory, which we think is sufficient for J. Moll, which is no non-speculative proof of damages. But let's go back to the source here. Was there any material concealment in this case? And again, I can't improve on the district court's own meticulous analysis, which is at pages A13 to 17, but no reasonable juror could find that there was a material difference between telling XU, FISCO's telling XU in April of 2006, I'm sorry, your application to the Governance Council for a Solutions Plus partnership has not been approved. And it's undisputed through ICE's own admission at page A1215 and A1216 that she was told it's not approved. That's not in dispute. It can't be denied. There's no material difference, as the district court found, between being told you're not approved for a partnership and being told you're denied. Well, couldn't one fairly assume that a reasonable person would behave differently? I mean, is that the question we're asking, whether or not if they had been told they were denied rather than being not approved, whether that would have led them to more aggressively explore other opportunities, develop its product, and so forth? The jury presumably bought that, right? Yes, Your Honor. Well, yes, Your Honor. The jury did buy some kind of conspiracy theory, but the only fraud, let's be very clear, there was only one fraud theory allowed to go to the jury. And here, the district court bent over backwards to allow XU to bring to the jury a fraud theory it hadn't even properly pleaded. Remember, it has other fraud theories that the district court throws out at summary judgment. Page 10, 824, the district court says you get to go to the jury with one theory and one theory only, and that is that Cisco fraudulently concealed that you were denied from the program rather than not approved. And as the district court makes absolutely clear, there's only a material difference that would have changed behavior between those two statements if denial means with finality and not approved means subject to reconsideration. But there is no evidence, no evidence, that the application was denied with finality. And if I could just summarize very briefly, Your Honor, if you look at all of the evidence in the case, and I'm not, with respect to my learned friend, I'm not relying at all on Cisco's evidence. I'm relying on XU's evidence. Ms. Ice, let's just go with XU's Ms. Ice. First, she testifies at 8-12-15, 12-16, and she says, no, Mr. Hernandez was our champion. He kept trying to get our application approved after April of 2006. Don't take it from me, take it from Ms. Ice in July of 2006. She's sending emails in with PowerPoint slides saying, hey guys, we hear your concerns that we have no customers, we have no market traction. Let me take your argument, and it's well outlined in the briefs. Let me ask you to just cover briefly before you sit down the two other points that Mr. Dunn raised. One, the trade secret point, and the other, the punitive damages point. Punitive damages, there should be no new trial, but punitive damages can't apply to Mr. Hernandez. He's a low-level employee in a subunit of Cisco. He's in the CCBU. He reports to two people above him in the chain. He has no corporate authority that would subject him under California law to be able to speak for the company as a managing agent or director. It's not even close. He's reporting to higher-ups. He's continuing to recommend that XU be admitted to Solutions Plus to senior vice presidents like Mr. Wiese and senior managers like Mr. McLeod. He's way down the chain, even with respect to his subunit in the company. He can't control the approval of the application. All he can do is submit it. So he doesn't come close to the kind of level of employee who could subject Cisco to punitive damages. And on trade secrets, Your Honor, to find that, as Your Honor observed, the district court was correct, I'm sorry, you observed that the district court found that there was no evidence of use, and there is no evidence of use. And to see that this is the case, all you have to do is go into the blue brief and compare page 34. It's all under seal, so I'll do this with caution. Compare the blue brief, page 34. That's XU's supposed diagram where it has the trade secrets. Then compare it to the blue brief, pages 35 and 36. That's where Cisco's product is depicted in two flow charts. There's two products, two flow charts. Now, a couple of things here. First, XU definitely waived the comparison between these diagrams, which is the entire core of its trade secret misappropriation case, because it never did this color-coded comparison in the district court. And the same thing here. So it's waived. If you go to page 25 of the gray brief, you'll find that if you look at all the sites there, it doesn't take you to any of these color-coded diagrams or any diagrams at all, much less a comparison. But then I invite you to do the comparison yourself. The trade secrets reside, if at all, in the non-shaded parts of page 34. So even if you can match the shaded parts of page 34, the XU diagram, to the shaded parts of pages 35 and 36 of the Cisco diagram, you're going to be comparing high-level, unprotectable concepts that have nothing to do with the trade secret. As XU's own expert said, the trade secret resides, or as one of Cisco's folks called it, the secret sauce resides, in the unshaded parts of the chart of page 34. And therefore, Cisco, even if you can find some correlation between the shaded parts, there's no evidence whatsoever of use of the three through 11 on page 34, and so there's no evidence of trade secret misappropriation. Summary judgment was correct on that as well. So we respectfully submit this is a very easy case for affirmance on both the fraud and the trade secret claims, and contract claims were waived. If there are no further questions, I respectfully request that you affirm. Thank you. Let me deal with a couple of points. One is Ms. Sullivan referred to the fact that the district court said that only if denial means finality, then we would have a case, if at all. The fact is that our evidence is that it was final. Sundara said it was final. They gave us a document that said it was final. They never showed us another document or any other testimony that said it wasn't final. But there was discussion about activity after that in terms of people reflecting and reconsidering and continuing to talk about that, right? Your Honor, the activity after that, I would refer you to several pages. Let me read you on page 509-3. This is from Ross Daniels to Hernandez. My take is we aren't doing anything but stalling with XU. As soon as we commit Torero, we have enough of a near-term roadmap to pitch our own solution instead of XU. There are multiple documents. Here's another one, 508-5. For now, this is from Ross Daniels to Sundara. For now, I need you to continue moving this slowly along and stall when we need to. They were stalling. The reason for their doing this was they were afraid that we would go with Genesis. Ms. Sullivan said there was a document 2005. There's also a document 2006 by Sundara at 508-5. Page 6, the very document, well, the next page of the document, there is also the risk of Genesis buying out XU and then we have lost everything. They were stalling. They were looking for time so they could develop a competing product. They may have been talking, but they misled XU into thinking that they were talking seriously. They were not talking seriously. Elizabeth Ice thought that Hernandez was her champion. He ended up not being her champion. He ended up being her nemesis in the reality. She talked about Braddock's damages being speculative. She talked about the reports being excluded. They were excluded, but he was permitted under the federal rules of evidence to testify about them. In fact, the expert for Cisco said that was conventional practice to rely on reports like this. He also said it was conventional practice to get information from the client. She has totally ignored the evidence that I mentioned in my opening. Citigroup said it was a breakthrough. They said it was worth ten to hundreds of millions of dollars. That's substantial evidence. The fact that we didn't have a witness from one of these groups is irrelevant. We had testimony on it. We had Friedman testimony. We had Ice testimony. We had testimony from the Cisco witnesses. The jury was entitled to rely on that testimony. The fact is, Sullivan has basically ignored the fact that Weiss, the key member of the governance council said if he were XU, he'd want to know there was a denial. Sundara said essentially the same thing. Knowing of a denial could have been important to XU, and indeed it was important. They were being toyed with, taken along, thinking that they had a great partner, and it turned out they didn't have a great partner. It turned out that that partner was trying to do them in and substitute its own system for XU's system. The fact that they didn't have any customers or sales, the evidence shows that Cisco signed deals worth millions of dollars with five companies, I believe is the number, that had no sales. That is irrelevant. As to the trade secrets... One more sentence on trade secrets. Oh, I'm minus? Yes, you're minus. I finished. Thank you. That's my sentence.